UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD OF INDIANA AND KENTUCKY, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:16-cv-01807-TWP-DML |
| COMMISSIONER, INDIANA STATE DEPARTMENT OF HEALTH in his official capacity, MARION COUNTY PROSECUTOR, LAKE COUNTY PROSECUTOR, MONROE COUNTY PROSECUTOR, and TIPPECANOE COUNTY PROSECUTOR, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

This matter is before the Court on a Motion for Preliminary Injunction filed pursuant to Federal Rule of Civil Procedure 65(a) by Plaintiff Planned Parenthood of Indiana and Kentucky, Inc. ("PPINK"). (Filing No. 6.) PPINK filed this suit against the Commissioner of the Indiana Department of Health, and the prosecutors of Marion County, Lake County, Monroe County, and Tippecanoe County (collectively, "the State"), all in their official capacities. PPINK maintains that a provision of Indiana House Enrolled Act No. 1337 ("HEA 1337"), which went into effect on July 1, 2016, creates an undue burden on a woman's right to choose to have an abortion and is therefore unconstitutional. It seeks to enjoin this provision during the pendency of this litigation. The parties submitted evidence, and the Court held a hearing on PPINK's motion.

The provision challenged by PPINK is found in Indiana Code § 16-34-2-1.1(a)(5). Prior to the enactment of this provision, women in Indiana were required to have an ultrasound before having an abortion, but they could have it on the same day as the abortion. Women were also

required to have an informed-consent appointment at least eighteen hours prior to an abortion, during which they received state-mandated information regarding pregnancy and abortion. The provision challenged by PPINK (hereinafter, "the ultrasound law" or "the new ultrasound law") now requires a woman to have an ultrasound at least eighteen hours prior to an abortion and at the same time she receives the informed-consent information otherwise required by the statute. The new ultrasound law combined two previously existing requirements – the ultrasound requirement and the eighteen-hour informed consent requirement.

For the reasons explained below, PPINK is likely to succeed on the merits of its challenge to the new ultrasound law because it creates an undue burden on a woman's right to choose to terminate her pregnancy. "To determine whether the burden imposed by the statute is undue (excessive), the court must weigh the burdens against the state's justification, asking whether and to what extent the challenged regulation actually advances the state's interests." *Planned Parenthood of Wisconsin, Inc. v. Schimel*, 806 F.3d 908, 919 (7th Cir. 2015). PPINK presents compelling evidence that women, particularly low-income women, face significant financial and other burdens due to the new ultrasound law. The State's primary justification for the law is to promote fetal life—that is, to convince women to choose not to have an abortion by having them view their ultrasound at least the day before the abortion rather than the day of the abortion. But it presents little evidence, and certainly no compelling evidence, that the new ultrasound law actually furthers that interest. Simply put, the State has not provided any convincing evidence that requiring an ultrasound to occur eighteen hours prior to an abortion rather than on the day of an abortion makes it any more likely that a woman will choose not to have an abortion. Given the dearth of evidence that the State's interest is actually furthered by the new ultrasound law, the burdens it creates on women seeking to terminate their pregnancies – which are significant even if

2

not overwhelming – dramatically outweigh the benefits, making the burdens undue and the new ultrasound law likely unconstitutional.  PPINK faces irreparable harm of a significantly greater magnitude if this provision is not enjoined than that faced by the State from an injunction.

Accordingly, PPINK's motion for a preliminary injunction is **GRANTED**.  (Filing No. 6).

## I.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right.  In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "To obtain a preliminary injunction, a party must establish [1] that it is likely to succeed on the merits, [2] that it is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in its favor, and [4] that issuing an injunction is in the public interest."  *Grace Schools v. Burwell*, 801 F.3d 788, 795 (7th Cir. 2015); *see Winter*, 555 U.S. at 20.  "The court weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor."  *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015).  "The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief."  *Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 678 (7th Cir. 2012) (citation and internal quotation marks omitted).  "Stated another way, the district court 'sit[s] as would a chancellor in equity' and weighs all the factors, 'seeking at all times to minimize the costs of being mistaken.'"  *Id.* (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)).

## II.   <u>BACKGROUND</u>

PPINK operated twenty-three health centers in Indiana on the date this action commenced, but financial considerations have required PPINK to close and consolidate several of its health centers.   When this process is complete, PPINK will operate seventeen health centers across Indiana.  Four of PPINK's seventeen health centers offer abortions services.  Three of the health centers, located in Bloomington, Merrillville, and Indianapolis, offer both surgical and medication abortion services.  The health center in Lafayette provides only medication abortions.  The only providers of non-medically indicated abortion services in Indiana that are not affiliated with PPINK are located in Indianapolis.

PPINK performs surgical abortions through the first trimester of pregnancy, which is thirteen weeks and six days after the first day of a woman's last menstrual period.  Medication abortions are available up to nine weeks after the first day of a woman's last menstrual period. The only providers of abortion services in Indiana after the first trimester are hospitals or surgical centers that generally provide abortions only when the abortion is medically indicated because of fetal abnormality or a threat to the woman's health.  Abortions at these locations are rare: in 2015, only 27 out of the 7,957 abortions performed in Indiana occurred in a hospital or surgical center.

The Indiana legislature enacted HEA 1337, which went into effect on July 1, 2016.  This Act created several new provisions and amends several others regarding Indiana's regulation of abortions and practices related to abortions.  In this action PPINK challenges just one of those provisions:  the new ultrasound law.  The parties do not dispute the key background facts related to the new ultrasound law.  The Court will therefore briefly set forth the challenged provision and summarize the undisputed background evidence related to it.

Indiana Code § 16-34-2-1.1(a) provides that "[a]n abortion shall not be performed except with the voluntary and informed consent of the pregnant woman upon whom the abortion is to be performed." Consent to an abortion is "voluntary and informed" if the information set forth in the statute is provided to the patient at least eighteen hours prior to the abortion. *See id.* For example, the mandated information includes the nature of the proposed procedure; scientific information regarding the risks of and alternatives to the procedure; notification "[t]hat human physical life begins when a human ovum is fertilized by a human sperm"; the probable gestational age of the fetus at the time the abortion is to be performed, including a picture of the fetus and other information about the fetus at its current stage of development; notice that a fetus can feel pain at or before twenty weeks; and information regarding alternatives to abortion and other support services available. Ind. Code § 16-34-2-1.1(a)(1)-(2).

Prior to the enactment of the new ultrasound law, the statute also provided that "[b]efore an abortion is performed, the provider shall perform, and the pregnant woman shall view, the fetal ultrasound imaging and hear the auscultation of the fetal heart tone," unless the woman elected in writing to not view the ultrasound or listen to the fetal heart tone. Ind. Code § 16-34-2-1.1 (repealed). The new ultrasound law changed the timing, but not the substance, of this requirement. It provides:

> At least eighteen (18) hours before an abortion is performed and at the same time that the pregnant woman receives the information required by subdivision (1), the provider shall perform, and the pregnant woman shall view, the fetal ultrasound imaging and hear the auscultation of the fetal heart tone if the fetal heart tone is audible unless the pregnant woman certifies in writing, on a form developed by the state department, before the abortion is performed, that the pregnant woman:
>
> (A) does not want to view the fetal ultrasound imaging; and
>
> (B) does not want to listen to the auscultation of the fetal heart tone if the fetal heart tone is audible.

Ind. Code § 16-34-2-1.1(a)(5).

Before the new ultrasound law, PPINK provided the state-mandated information to its patients at least eighteen hours prior to the abortion during an informed-consent appointment, which were offered at any of PPINK's seventeen health centers across the state. This allowed women who live a long distance from one of the four health centers that offer abortion services to make only one lengthy trip in order to obtain an abortion. These women would typically have an ultrasound on the day of the abortion and would at that time be offered the opportunity to view the ultrasound image and listen to the auscultation fetal heart tone, as required by law. The physician who would perform the abortion would interpret the ultrasound and answer any questions the woman might have.

The new ultrasound law required PPINK to change its practices, given that ultrasounds must now occur during the informed-consent appointment, yet ultrasounds were only available at the four PPINK health centers that offer abortion services. Thus women living a significant distance from one of those four health centers were faced with either two lengthy trips to one of those health centers or an overnight stay nearby. PPINK attempted to ease this burden by offering ultrasounds at two additional health centers that do not offer abortion services. Specifically, PPINK purchased ultrasound equipment for its Mishawaka health center and trained a staff member at its Evansville health center to use ultrasound equipment already located there. Therefore, women can now travel to one of six PPINK health centers for their informed-consent appointment, which includes the mandated ultrasound, before travelling at least eighteen hours later to one of the four PPINK health centers that offers abortion services. Despite its ability to partially mitigate the burdens imposed by the new ultrasound law, PPINK contends that the new

ultrasound law creates an undue burden on its patients' constitutional right to terminate their pregnancies.

### III.   DISCUSSION

To obtain a preliminary injunction, PPINK must establish the following four factors: "[1] that it is likely to succeed on the merits, [2] that it is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in its favor, and [4] that issuing an injunction is in the public interest." *Grace Schools*, 801 F.3d at 795.  The first two factors are threshold determinations; "[i]f the moving party meets these threshold requirements, the district court 'must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied.'" *Stuller, Inc.*, 695 F.3d at 678 (quoting *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)).  The Court will address the first two threshold factors in turn, before addressing the final two factors together.

### A.   Likelihood of Success on the Merits

The parties acknowledge that the propriety of issuing a preliminary injunction rests almost entirely on whether PPINK has a likelihood of success on the merits of its claim.  The importance of this factor has led the parties to vigorously dispute both the proper legal test and how that legal test should apply to the evidence presented.  The Court's analysis of these disputes begins with an overview of the constitutionally protected right for a woman to choose to terminate her pregnancy, before turning to the parties' disputes regarding the legal standard and its application.

The Supreme Court has long held that "[i]t is a constitutional liberty of the woman to have some freedom to terminate her pregnancy." *Planned Parenthood v. Casey*, 505 U.S. 833, 846 (1992) (plurality opinion).  This right is grounded in the right to privacy rooted in "the Fourteenth

Amendment's concept of personal liberty." *Roe v. Wade*, 410 U.S. 113, 153 (1973). But as the Supreme Court's "jurisprudence relating to all liberties . . . has recognized, not every law which makes a right more difficult to exercise is, *ipso facto*, an infringement of that right." *Casey*, 505 U.S. at 873. Therefore, "[t]he fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it." *Id.*

From the recognition that no rights are absolute follows the necessity of a legal test to determine whether a particular regulation that incidentally affects the exercise of a right is constitutional. In the context of abortion regulations, the undue burden test governs. The Supreme Court recently set forth this test as follows: "there 'exists' an 'undue burden' on a woman's right to decide to have an abortion, and consequently a provision of law is constitutionally invalid, if the 'purpose or effect' of the provision 'is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.'" *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2299 (2016) (emphasis omitted) (quoting *Casey*, 505 U.S. at 878 (plurality opinion)).

Both the Supreme Court and the Seventh Circuit have made clear that applying the undue burden test requires balancing: "The rule announced in *Casey* . . . requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Id.* at 2309; *see Schimel*, 806 F.3d at 919 ("To determine whether the burden imposed by the statute is undue (excessive), the court must weigh the burdens against the state's justification, asking whether and to what extent the challenged regulation actually advances the state's interests. If a burden significantly exceeds what is necessary to advance the state's interests, it is undue, which is to say unconstitutional.") (citation and quotation marks omitted). Importantly, this balancing does not involve a determination of the applicable level of scrutiny and then an application of the

State's justification to that level of scrutiny.  *See Whole Woman's Health*, 136 S. Ct. at 2319 ("[T]he balancing in the abortion context should not be equated with the judicial review applicable to the regulation of a constitutional protected personal liberty with the less strict review applicable where, for example, economic legislation is at issue.").  Instead, the Court must simply weigh the burdens against the benefits and determine if the burdens "significantly exceed[] what is necessary to advance the state's interest."  *Schimel*, 806 F.3d at 919.

Also important when conducting the required balancing is the extent to which the Court defers to legislative findings or, instead, independently evaluates the evidence presented by the parties.  The Supreme Court has made clear that courts should do the latter: "when determining the constitutionality of laws regulating abortion procedures, [the Supreme Court] has placed considerable weight upon evidence and argument presented in judicial proceedings."  *Whole Woman's Health*, 136 S. Ct. at 2310; *see Gonzales v. Carhart*, 550 U.S. 124, 165 (2007) ("The Court retains an independent constitutional duty to review factual findings where constitutional rights are at stake.").

## 1.    The Proper Legal Standard

PPINK maintains that this Court need only apply the undue burden test outlined above, which requires weighing the burdens imposed by the new ultrasound law against the benefits to the State's asserted interest.  The State takes issue with courts balancing the burdens against the benefits of an abortion regulation in cases such as this one where the State's primary asserted interest is promoting fetal life.  It argues that the Court should simply apply *Casey*, not the Supreme Court's recent decision in *Whole Woman's Health*, because the balancing in *Whole Woman's Health* "applies only to abortion restrictions designed to protect maternal health."  (Filing No. 35 at 15).  This is true, the State says, because the asserted state interest in *Whole Woman's Health*

was to protect maternal health, and the standards applied in that case are limited to that context; that type of balancing "is a poor fit for this type of regulation" because "the two sides' interests [here] are fundamentally at odds with one another.  PPINK's goal is to help the woman carry out her decision to terminate her pregnancy and the State's goal is to persuade the woman to reconsider that decision."  (Filing No. 35 at 17.)  PPINK replies that the State "fundamentally misconstrues *Whole Woman's Health*" because the Supreme Court in that case was not applying an alternative standard; it instead "definitively interpreted [and applied] *Casey*'s 'undue burden' standard." (Filing No. 38 at 9.)

The Court agrees with PPINK.  The premise of the State's argument—that different standards are applied in *Casey* and *Whole Woman's Health*—is belied by those decisions.  Not once in *Whole Woman's Health* did the Supreme Court suggest that different versions of the undue burden test apply depending on the State's asserted interest, or even that different versions of the test exist at all.  Instead, the Supreme Court in the introduction of *Whole Woman's Health* explicitly stated that it was applying *Casey*'s undue burden test.  *See Whole Woman's Health*, 136 S. Ct. at 2299 ("We must here decide whether two provisions of Texas' House Bill 2 violate the Federal Constitution as interpreted in *Casey*.").  Given that the Supreme Court made clear in *Whole Woman's Health* that it was applying *Casey*, it inexorably follows that there are not two distinct undue burden tests applied in *Casey* and *Whole Woman's Health*.

Three additional considerations place this question beyond dispute.  First, the State points to the fact that the Supreme Court in *Whole Woman's Health* focuses on whether the regulations at issue benefit women's health.  But the Supreme Court did so only because that was the state's interest that Texas argued that the challenged regulations furthered—not because it is the only context in which balancing is appropriate.  This is evident because, when the legal standard is set

10

out in *Whole Woman's Health*, it is not set forth in terms limiting it to laws justified on the basis of maternal health; it is often stated in general terms such that it clearly applies regardless of whether the state's interest is promoting women's health or otherwise. *See id.* at 2309 ("The rule announced in *Casey* . . . requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer."). The Seventh Circuit has similarly stated the balancing test in general terms. *See Schimel*, 806 F.3d at 919 ("To determine whether the burden imposed by the statute is undue (excessive), the court must weigh the burdens against the state's justification, asking whether and to what extent the challenged regulation actually advances the state's interests."); *id.* at 921 ("[A] statute that curtails the constitutional right to an abortion . . . cannot survive challenge without evidence that the curtailment is justifiable by reference to the benefits conferred by the statute.").

Second, the Supreme Court in *Casey* applied the undue burden standard when evaluating both provisions justified as promoting women's health and those justified as promoting fetal life, but it did not at all suggest that the undue burden test applies differently to those provisions. *See Casey*, 505 U.S. at 877-78 (discussing abortion regulations "designed to persuade [a woman] to choose childbirth over abortion" and regulations "designed to foster the health of a women seeking an abortion" as both valid as long as they do not constitute an undue burden). If, as set forth in *Casey*, there is a singular undue burden test that applies regardless of the State's asserted justification, and if the Supreme Court in *Whole Woman's Health* applied the undue burden test in *Casey*, its articulation and application of that singular test is binding on this Court irrespective of the State's asserted justification for the new ultrasound law.

Third, and perhaps most tellingly, the Supreme Court in *Whole Woman's Health* directly points to abortion regulations challenged in *Casey* that were not justified as promoting women's

health as support for its conclusion that the undue burden test requires balancing the burdens against the benefits of the challenged law. The Supreme Court rejected the notion that "a district court should not consider the existence or nonexistence of medical benefits when considering whether a regulation of abortion constitutes an undue burden." *Whole Woman's Health*, 136 S. Ct. at 2309. And in the very next sentence and the citations accompanying it, the Supreme Court made clear that this concept is not limited to the assessment of *medical* benefits, but to whatever benefits the State asserts that the challenged law provides. Specifically, the Supreme Court stated that "[t]he rule announced in *Casey* . . . requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer," and then it cited to portions of *Casey* where this balancing was applied to provisions—the spousal notification and parental consent provisions—that were not justified on women's health grounds. *Id.* (citing *Casey*, 505 U.S. at 887-98, 899-901). If the balancing discussed in *Whole Woman's Health* was limited to the context of abortion regulations justified as promoting women's health, the Supreme Court would not have cited to portions of *Casey* applying that balancing to abortion regulations with other justifications.

For all of these reasons, the State's position that the balancing set forth in *Whole Woman's Health* that requires weighing the burdens and benefits of the challenged law applies only to abortion regulations justified as promoting women's health is based on the false premise that the undue burden test changes based on the State's asserted justification for the law. The Supreme Court and the Seventh Circuit have only discussed the undue burden test as a singular test, and this Court's application of that test is directed by how these courts have explicated and applied that test. It is to the application of the undue burden test that the Court now turns.

### 2.      Whether the New Ultrasound Law Creates an Undue Burden

In *Whole Woman's Health*, the Supreme Court concluded that the district court "applied the correct legal standard" when it "considered the evidence in the record—including expert evidence, presented in stipulations, depositions, and testimony"—and it "then weighed the asserted benefits against the burdens."  136 S. Ct. at 2310.  This is therefore the approach the Court must take here.  The Court will first make findings and evaluate the persuasiveness of the evidence regarding the burdens and benefits created by the new ultrasound law, including by discussing the parties' responses to each other's evidence.  The Court will then weigh the burdens against the benefits.

### a.      Burdens

PPINK maintains that the new ultrasound law is burdensome because it requires women seeking an abortion who live significant distances from one of the six PPINK health centers that provide ultrasounds during the informed-consent appointments to make two lengthy trips to have an abortion—one for the informed-consent appointment and a second for the abortion itself.  In order to evaluate the burdens imposed by the new ultrasound law, the Court must first define the group of women whose burdens must be analyzed.

"The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant."  *Casey*, 505 U.S. at 894; *see id.* ("The analysis does not end with the [subset] of women upon whom the [challenged] statute operates; it begins there."). Thus the class of women on whom the Court must focus, as in *Casey* and *Whole Woman's Health*, is "a class narrower than 'all women,' 'pregnant women,' or even 'the class of *women seeking abortions*.'"  *Whole Woman's Health*, 136 S. Ct. at 2320 (quoting *Casey*, 505 U.S. at 894-95).  As discussed in detail below, the new ultrasound law is a restriction for women for whom an additional

lengthy trip to a PPINK health center for their informed-consent appointment acts as an impediment to their ability to have an abortion.  More specifically, the burdened group is low-income women who do not live near one of PPINK's six health centers at which ultrasounds are available.  This is because, as noted above, PPINK now only offers the informed-consent appointments at six rather than seventeen of its health centers, since the new ultrasound law requires the mandatory ultrasound to occur during this appointment.

It is unsurprising that the financial burdens discussed below disproportionately impact PPINK's low-income patients, who constitute a significant portion of PPINK's patients receiving abortion services.  Poverty experts generally use 200% of the Federal Poverty Line ("FPL") as an approximation of the income necessary to survive on one's own.  (Filing No. 24-2 at 4.)  Many experts describe those at or below 100% of the FPL as "poor," and individuals between 100% and 200% of the FPL as "low-income."  (Filing No. 24-2 at 4.)  Statistics from the 2016 fiscal year reveal the following regarding PPINK's patient's income levels relative to the FPL:

| Income Range | Percent of Patients |
|---|---|
| Unknown | 22% |
| 0-100% FPL | 37% |
| 101-150% FPL | 11% |
| 151-200% FPL | 8% |
| 201-250 % FPL | 5% |
| 251%+ FPL | 16% |

(Filing No. 24-1 at 14).  The income levels of PPINK's patients are similar to national statistics, which reflect that approximately 75% of abortion patients have incomes at or below 200% FPL, and 49% had incomes at or below 100% FPL.  (Filing No. 24-2 at 5.)

Having set forth the relevant group, PPINK's evidence regarding the burdens faced by this group due to the new ultrasound law are discussed in four overlapping categories: (1) increased travel distances; (2) delays in obtaining abortion services; (3) expert testimony; and (4) specific

women who have reported adverse effects from the ultrasound law.  The State's challenge, if any, to this evidence is discussed and evaluated in conjunction with each category.

### i.    <u>Increased Travel Distance to Informed-Consent Appointments</u>

<u>Lengthy Travel.</u>  Many women will have to travel hundreds of miles to their informed-consent appointments now that PPINK can only offer these appointments at six, rather than seventeen, of their health centers.  Such travel is especially difficult for low-income women who do not have access to a car.  For example, women from Allen County—which contains Fort Wayne, the second most populous city in Indiana—have to travel approximately 174 miles roundtrip for their informed-consent appointment, assuming that they can get an appointment at the nearest ultrasound-equipped health center in Mishawaka.  (Filing No. 24-1 at 13-14.)  In fiscal year 2016, 251 women from Allen County obtained abortions from PPINK.  Prior to the new ultrasound law, over 86% of women from Allen County who had an abortion with PPINK had their informed-consent appointment at the PPINK health center located in Fort Wayne.  (*See* Filing No. 24-1 at 3-4.)  All of these women—and women who similarly do not live near one of the six PPINK health centers offering ultrasounds—now face lengthy travel to their informed-consent appointments.[1]

The State suggests that PPINK could avoid requiring its patients to undertake additional lengthy travel by simply accepting ultrasounds from other healthcare providers, which it currently does not permit.  (Filing No. 35 at 32.)  The State also contends that PPINK could mitigate the burdens caused by lengthy travel by simply making different business decisions, such as buying less expensive ultrasound machines so that more health centers can offer the informed-consent

---

[1] There is no evidence regarding how many or what proportion of PPINK's patients live near one of the six PPINK health centers offering the informed-consent appointment.  This number, however, is ultimately irrelevant because for women for whom one such center is local, the new ultrasound law is "irrelevant" and thus they are not the focus of the Court's burden analysis.  *Casey*, 505 U.S. at 894.

appointment.  (Filing No. 35 at 33.)  These arguments are two of the State's primary attempts to undermine PPINK's evidence of burdens and are addressed in turn.

There are two difficulties with the State's position as to PPINK's pre-existing policies. First, the undue burden inquiry does not contemplate re-examining every pre-existing policy or practice of abortion providers to see if they could further mitigate burdens imposed by a new abortion regulation.  The Seventh Circuit's analysis in *Schimel* illustrates this.  When assessing the burdens imposed, the Seventh Circuit accepted Planned Parenthood's policies and then evaluated how the challenged law burdened the right to choose to have an abortion given those polices.  It did not suggest that Planned Parenthood had an obligation to change its policies to lessen the burden.

For example, the Seventh Circuit noted that Planned Parenthood in Wisconsin performs abortions for women who have been pregnant up to eighteen weeks and six days.  *See Schimel*, 806 F.3d at 918.  It recognized that delays in obtaining abortions caused by the challenged law would "push [some women] past the . . . deadline for Planned Parenthood clinics' *willingness* to perform abortions."  *Id.* (emphasis added).  And it did not suggest that Planned Parenthood could provide later term abortions like another abortion clinic in Wisconsin offered; it instead counted this fact as a burden imposed by the challenged law, not as one caused by Planned Parenthood's policy.  *See id.* ("Women seeking lawful abortions that late in their pregnancy, either because of the waiting list or because they hadn't realized their need for an abortion sooner, would be unable to obtain abortions in Wisconsin.").

Accordingly, PPINK is correct that undue burden inquiry asks, "given the reality of how PPINK provides its abortion services, . . . is [there] an undue burden on its patients."  (Filing No. 38 at 13.)  The State has not pointed to any case in which a court suggested that burdens created

by a new abortion regulation were undermined based on the abortion provider's failure to change a pre-existing policy, and therefore the Court will not re-examine each pre-existing PPINK policy and determine whether, if it were changed, it would mitigate the burdens imposed by the new ultrasound law.

Second, even if this were a proper consideration, the State's suggested policy change is not a feasible one.  To support its position regarding PPINK's failure to accept ultrasounds from other medical providers, the State points to the deposition testimony of PPINK's medical director Dr. John Stutsman that he would not necessarily decline to permit outside ultrasounds, but that is PPINK's national policy.  (Filing No. 35-4 at 27.)  But as PPINK points out, the new ultrasound law *requires* that the ultrasound be provided "at the same time that the pregnant woman receives" the other mandated informed-consent information, *see* Ind. Code § 16-34-2-1.1(a)(5), and there is no evidence to suggest that a woman could receive that information at a non-PPINK hospital or healthcare facility.  This is especially true given that, at the time of the ultrasound, the law requires the patient to provide the name of the physician performing the abortion, the physician's license number, and a telephone number at which they can be reached at any time.  Ind. Code § 16-34-2-1.1(a)(1)(A).  There is no evidence that an abortion patient could provide such information if she was not at a PPINK health center.  Thus, the State's suggestion that PPINK could simply change its policy and begin accepting ultrasounds from other providers—even if it were a proper consideration—is not an available method to mitigate the lengthy travel that is now necessary for many women in Indiana.

Like the State's position with regards to PPINK's pre-existing policies, its contention that PPINK could make different business decisions to mitigate the burdens caused by the new ultrasound law is unpersuasive.  As an initial matter, the State has again failed to point to a case in

which a court has discounted burdens imposed by a new ultrasound regulation because the abortion provider could have made better or different financial choices.

To the extent this is a proper consideration at all, the State has failed to show that PPINK's business decisions are in any way causing the burdens at issue.   For example, the State argues that PPINK could purchase cheaper ultrasound machines and therefore have them available at more than six health centers.  (Filing No. 35 at 33-34.)  PPINK's ultrasound machines cost $25,000.00, and the State presents evidence that high-quality, portable ultrasound machines are available for as little as $4,250.00 to $8,500.00.  (Filing No. 35-1 at 6).  In response, PPINK's Director of Abortion Services, Forest Beeley, explains why PPINK purchases the $25,000.00 machine from GE Healthcare.  Specifically, she notes that this ultrasound machine comes with an extended warranty that cheaper machines do not have, and the contract with GE Healthcare includes planned maintenance, replacement parts, software updates, support, and a guaranteed 24-hour response time if there are issues, among other benefits.  (Filing No. 38-1 at 3-4.)  Moreover, the ultrasound machine integrates with PPINK's electronic record system, which is critical for when the ultrasound and abortion appointments occur at different health centers.  (Filing No. 38-1 at 4.) Given all of these additional services and features that are in PPINK's view "essential," Ms. Beeley testifies that these ultrasound machines are the most economical available.  (Filing No. 38-1 at 4.) Thus, while the State has pointed to a very specific purchase by PPINK and suggested they could make a better purchase decision, the evidence reveals that PPINK is making the most economical decision available for its needs.

Moreover, given all the evidence presented, the Court credits the attestation of PPINK's President and CEO, Betty Cockrum, that "PPINK is unable to afford the expenses, both in terms of equipment and staffing, of providing ultrasound machines and technicians at all of its health

centers." (Filing No. 24-1 at 8.)  Notably, PPINK reacted to the new ultrasound law by providing ultrasounds at two health centers at which they were previously unavailable.  This undercuts any notion that PPINK is in any way not providing abortion services to the greatest extent possible; indeed, it is hard to fathom that an organization dedicated to providing abortions services would not do so.  And the evidence here reveals that PPINK has.

Finally, to the extent the State argues that PPINK is simply failing to shift more resources toward abortion services, this also does not undermine PPINK's evidence of burdens.  As a general matter, if the State could simply point out ways in which PPINK could allocate its resources differently to mitigate burdens imposed by the new ultrasound law, PPINK would never be able to make a successful undue burden challenge, given that only 7% of its patients receive abortion services.  (*See* Filing No. 35-5 at 35 (noting that only 7% of PPINK patients receive abortion services)).  This leaves all of the resources it dedicates to the healthcare needs of the other 93% of its patients, which of course *could* be dedicated to abortion services.  But this would essentially mean that no organization could challenge an abortion regulation as an undue burden unless it is dedicating 100% of its resources to abortions.

Moreover, if the State believes that PPINK could offer more abortion services than it does, it is the State's obligation to present specific evidence, not just a general assertion, that this is so. *See Whole Woman's Health*, 136 S. Ct. at 2317.  To the extent it has, such as with the price of ultrasound equipment, that evidence is unpersuasive.  Otherwise, a general assertion that PPINK should shift more resources toward abortion services is insufficient.

For these reasons, the State has failed to undermine PPINK's significant evidence of burden of increased travel due to the new ultrasound law.  The State's contentions that PPINK's

pre-existing policies and business decisions could further mitigate these burdens constitutes either an improper inquiry generally or are otherwise unpersuasive.

Absence from Employment.  Because the new ultrasound law now forces many women to travel significant distances for their informed-consent appointment, these women must now take an additional day away from work in order to have an abortion.  However, many low-income women do not have employment that pays them for days during which they do not work.  (Filing No. 24-1 at 15.)  The new ultrasound law thus requires these women to lose an additional day's wages, which adds yet another financial cost.  Many of these same women feel unable to take this additional time off work due to fear of losing their jobs for taking off two days in a short time period. (*See* Filing No. 24-1 at 15.)  As seen in the examples and expert testimony addressed below, this is yet another factor that makes the new ultrasound law burdensome for low-income women.

Child Care Expenses.  PPINK's policy prohibits children from being present during an ultrasound, which means the new ultrasound law prevents women from bringing their children to the informed-consent appointment when they used to be able to do so.  Therefore, women that must travel long distances to their informed-consent appointments must now bear the additional expense of child care for an additional day.  It is also not uncommon for women to delay scheduling an appointment because they cannot arrange childcare, which they now must do on two occasions rather than one.  (*See* Filing No. 24-1 at 15.)

The State points out that PPINK's policy regarding children's presence during an ultrasound is its choice.  The State presents the declaration of Dr. Christina Fuchs who testifies that such a policy is not required and that she frequently performs ultrasounds with children in the room simply by appropriately covering the mother with a sheet.  (Filing No. 35-1 at 6.)  PPINK

disagrees; it notes that it is a Planned Parenthood policy to not allow children at the ultrasound appointment because there is "a pretty serious risk of distraction."  (Filing No. 35-5 at 26.)

The State is again asking PPINK to change its pre-existing policy that is in place because PPINK believes that children are distracting to both the doctor and the patient during an important ultrasound procedure; indeed, it is this very procedure that the State contends will lead women to reflect and change their minds about having an abortion.  Yet, the State suggests PPINK should change a policy that facilitates a woman's ability to focus on the procedure to lessen the burden created by the new ultrasound law.  This is perplexing given that the State's asserted goal is to promote fetal life by encouraging women to reflect on the ultrasound image.  But in any event, as discussed above regarding PPINK's ultrasound policy, burdens are not evaluated by hypothesizing all of the ways in which abortion providers could change their pre-existing policies to mitigate the burdens imposed by a new abortion regulation.  Thus the State's suggestion that PPINK simply change its current policy does not undermine PPINK's evidence that childcare concerns present a burden for women, especially low-income women, who now have to travel long distances to their informed-consent appointments.

Keeping Abortions Confidential from Abusive Partners.  Some women who seek abortions from PPINK are in abusive relationships and fear for their safety if their partner were to discover that they were pregnant or that they wanted an abortion.  (*See* Filing No. 24-1 at 17-18.)  PPINK is aware that some of its patients face this problem, and one national study showed that 13.8% of women who had an abortion had been in an abusive relationship within a year before the abortion.  (Filing No. 24-1 at 17-18.)  For women in such relationships, it can be very difficult to arrange another lengthy day of travel and have it remain confidential.  (*See* Filing No. 24-1 at 17-18.)  This,

like the employment and childcare difficulties discussed above, is yet another burden caused by the ultrasound law.

### ii.  Delays in Abortion Services

Decrease in Health Center Availability.  All informed-consent appointments are now scheduled at six PPINK health centers rather than seventeen.  To accommodate the demand on these centers, PPINK often double-books appointments.  This, of course, causes women to wait much longer for their appointments when both women scheduled for an appointment show up, which exacerbates the problems caused by lengthy travel time—lost wages, childcare expenses, and confidentiality concerns.  Moreover, there is no guarantee that women can be scheduled for an informed-consent appointment at the PPINK health center nearest them, so the travel distances may be even farther for some women.  (*See* Filing No. 24-1 at 9-10.)  PPINK is currently asking staff to stay as late as necessary to complete all of the appointments, which is an unsustainable solution for the organization.  (Filing No. 24-1 at 11.)  Because abortion services are only a small percentage of the health services provided by PPINK, at some point in the near future it will have to revert to its "normal"—that is, pre-July 1, 2016—allocation of resources, which will cause further delays in women being able to schedule their ultrasound appointments and therefore their abortion appointments.  (Filing No. 24-1 at 12.)

As to concerns regarding the availability of the nearest health center, the State points out that PPINK's President and CEO, Ms. Cockrum, admitted during her deposition that she is uncertain how many women are unable to travel to the health center closest to them, and her statement that some women are unable to do so is "anecdotal."  (Filing No. 35-5 at 31.)  But even discounting this aspect of the availability of the nearest health center, the fact that the health centers have to double-book appointments—which can cause patients to wait for their appointment for a

significant time—exacerbates the problems discussed above associated with significant travel in that it makes an already lengthy trip potentially much longer.

Delays Prevent Women from Obtaining an Abortion within the Limited Timeframe. The latest date a woman can obtain a surgical abortion at a PPINK health center is thirteen weeks and six days after her most recent menstrual period. In the 2016 fiscal year, 22.2% of women who had an abortion at a PPINK health center were between eleven weeks and thirteen weeks, six days pregnant, which is to say at most three weeks from the deadline. When medication abortions are excluded from these statistics, the percentage of surgical abortions occurring in the three weeks before the deadline increases to 34.3%. (Filing No. 24-1 at 7-8.) This is caused by a variety of factors, including a lack of recognition of pregnancy for several weeks and low-income women's difficulty amassing the funds and making the necessary logistical arrangements to have an abortion. (*See* Filing No. 24-1 at 7-8.)

Prior to the new ultrasound law, PPINK could usually accommodate a woman who sought an abortion close to the deadline by scheduling her for an informed-consent appointment at her local PPINK health center and then, the next day, an abortion. Due to the fact that many women now have to make two separate, lengthy trips to obtain an abortion and the delays caused by overburdened health centers, this is no longer possible, and some of these women will no longer be able to obtain an abortion within the required timeframe. (*See* Filing No. 24-1 at 12.)

This is especially true given that physicians are only available at the four health centers offering abortion services at limited times: Indianapolis (3 days/week); Bloomington (1 day/week); Merrillville (1.5 days/week); and Lafayette (1 day/week). (Filing No. 24-1 at 6.) With such limited availability, it is evident that even short delays scheduling the informed-consent

appointment could significantly delay the abortion appointment such that women will be unable to obtain an abortion within the thirteen week, six day timeframe.

### iii.   **Expert Testimony**

PPINK's expert in gender studies, poverty, and low-wage labor markets, Dr. Jane Collins, provides extensive evidence regarding how the increased expenses imposed by the new ultrasound law, for myriad reasons, burden low-income women in Indiana who seek an abortion.  She concludes that the new ultrasound law will cause some low-income women to "delay their abortions as they attempt to come up with the necessary money and make the logistical arrangements," and this will ultimately cause some of those women to be unable "to obtain an abortion at all." (Filing No. 24-2 at 3.)  Her conclusion is based on an analysis of low-income families' budgets and the additional costs associated with the new ultrasound law for women who live a significant distance from one of the six PPINK health centers where the informed-consent appointments must now occur.  (*See* Filing No. 24-2 at 5-19.)  Specifically, Dr. Collins discusses the additional costs of transportation, lost wages due to missed work, and child care created by the new ultrasound law, and shows that these additional costs, even though they would be insignificant to some, can dramatically impact low-income women's ability to obtain an abortion.  (*See* Filing No. 24-2 at 9-19.)

For example, Dr. Collins demonstrates how, for a woman living in Fort Wayne, Indiana seeking an abortion who has children and would lose wages for a day away from work, the additional expense caused by the new ultrasound law would be between $219.00 and $247.00. (Filing No. 24-2 at 18.)  While these additional costs can be absorbed by a middle-class family, many low-income families have a discretionary monthly budget of approximately $40.00, and

additional expenses of over $200.00 represents approximately a quarter of their entire monthly budget for all of life's necessities.  (Filing No. 24-2 at 19.)

Notably, these are expenses in addition to the costs of the abortion itself—namely, $410.00 for the abortion and $100.00 for the ultrasound.  (Filing No. 24-1 at 8; Filing No. 35-5 at 35.)  Dr. Collins explains that, to cover the costs associated with abortions, low-income women often have to go to great lengths.  For example, one survey revealed that one-third of women delayed or stopped paying basic bills in order to afford the cost of an abortion.  (Filing No. 24-2 at 21.)  Other women—50% as reported in one study—have to borrow the money from family and friends. (Filing No. 24-2 at 20.)  For women faced with the already high costs of an abortion and a lack of means to afford them, the additional expenses of lengthy travel, lost wages, and child care created by the new ultrasound law create a significant burden.

The State attempts to undermine Dr. Collins's evidence, primarily via reliance on evidence from their expert sociologist Dr. Anne Hendershot.  She attests that "Dr. Collins provides no concrete sociological evidence demonstrating that low-income women will be deterred from getting abortions due to the Ultrasound Law."  (Filing No. 35-3 at 3.)  This is true to the extent that Dr. Collins did not conduct specific sociological studies on how the new ultrasound law has impacted access to abortion in Indiana.  Dr. Collins's analysis instead rests on extrapolations from existing data and reasonable assumptions therefrom.  But that does not make Dr. Collins's examples and conclusions unpersuasive.  Although she did not conduct a study of low-income women in Indiana who have had an abortion, her thorough analysis of the costs imposed by the new ultrasound law appears well-grounded in the available data regarding the costs of transportation, lost wages, and child care.  This is especially true given that the State fails to take issue with any specific portion of Dr. Collins's predicate facts or overall analysis.

The only specific evidence presented by Dr. Hendershot that is in any way contrary to Dr. Collins's analysis and conclusion is Dr. Hendershot's statement that "[i]t is clear that the difficulties low-income women may face in accessing abortion services have not deterred women who are intent on terminating their pregnancies." (Filing No. 35-3 at 3.)  She bases this conclusion on studies from 2014 that show "as incidence of abortion has declined throughout the United States, the number of low-income women obtaining abortions continues to climb—demonstrating that low-income women are not deterred from accessing these services." (Filing No. 35-3 at 3.)

While increased numbers of low-income women throughout the United States may be having abortions, this fact does not speak to the narrow question before the Court, which is whether the new ultrasound law unduly burdens the right to an abortion for low-income women in Indiana who live a significant distance from one of the six relevant health centers.  In other words, one cannot extrapolate from an increase in the number of low-income women obtaining abortions nationally that the specific Indiana women at issue here are not unduly burden by the new ultrasound law.  Thus Dr. Hendershot's conclusion based solely on national statistics and not targeted to the group of Indiana women burdened by the new ultrasound law fails to undermine Dr. Collins's evidence.

To summarize, Dr. Collins's analysis demonstrates how burdens that may seem less significant to wealthier women can pose significant hurdles for low-income women who seek abortions.  Based on her analysis, especially given its congruence with the other evidence regarding burdens discussed herein, the Court finds credible and persuasive her ultimate conclusion that "as a result of the [new ultrasound law], a significant number of poor and low-income women [in Indiana] will no longer be able to obtain the abortions they seek or will be delayed in doing so." (Filing No. 24-2 at 23.)

iv.   **Specific Examples**

During the one-month period from the time that the new ultrasound law went into effect, July 1, 2016 and  on August 1, 2016, PPINK became aware of at least from six women who could not obtain an abortion due to the new ultrasound law.  (*See* Filing No. 24-1 at 16-17.)  PPINK subsequently provided evidence of three more women who could not obtain an abortion due to the ultrasound law.  (*See* Filing No. 38-1 at 2.)  These nine women serve as concrete examples of how the burdens discussed above can prevent certain low-income women from obtaining an abortion:

- The nearest PPINK health center to a woman seeking an abortion was over an hour away, and due to the fact that she has two young children and difficulty with transportation, she was unable to schedule the two lengthy trips during the thirteen week, six day timeframe in which an abortion is available.

- A woman from the Fort Wayne area did not schedule an abortion because of the two lengthy trips necessary.  She was eleven weeks, four days pregnant when she contacted PPINK, but could not miss work twice within the short timeframe remaining.

- A woman who previously had an abortion at PPINK called to schedule another, but ultimately said she could not schedule one after she was informed she would have to make two trips to the PPINK health center in Bloomington, Indiana.

- A woman living in a shelter with two young children decided not to schedule an abortion appointment because of the transportation and childcare difficulties two appointments would cause.

- A woman who recently started a new job after a year of unemployment stated that she could not drive the three-hour roundtrip to a PPINK health center on two separate occasions due to the combination of work, childcare, and transportation expenses, in addition to her concerns regarding the confidentiality of the abortion.

- A woman who did not learn she was pregnant for ten weeks faced a long delay before she could have her informed-consent appointment that required travel to a PPINK health center, and by the time of her appointment she was one day beyond the deadline for an abortion.

- A woman from Fort Wayne who had a previous abortion at PPINK called to schedule another, but once she was informed that she would have to make two lengthy trips to a PPINK health center, she said she could not afford to do so and did not schedule an abortion.

- A woman living an hour north of Fort Wayne who has special needs children declined to schedule an abortion after learning that she would have to make two lengthy trips for each appointment, as she could not afford to be away from her children for that long on two occasions.

- A woman from Fort Wayne who was approaching the deadline to have an abortion declined to schedule an appointment due to the required travel and risk of missing the deadline by the time she could schedule both appointments.

(Filing No. 24-1 at 16-17; Filing No. 38-1 at 1-2).

The State assails this evidence on two bases, neither of which are persuasive. First, the State argues that these examples are unreliable because they were passed on by the women to a PPINK staff member and then to the declarant, and neither the declarant nor anyone else at PPINK took any steps to verify the accuracy of the women's reports. (*See* Filing No. 35-5 at 31-33.) While the former concern is true, this evidence remains sufficiently reliable for assessing the propriety of a preliminary injunction. The Seventh Circuit has made clear "that a district court may grant a preliminary injunction based on less formal procedures and on less extensive evidence than a trial on the merits," *Dexia Credit Local v. Rogan*, 602 F.3d 879, 885 (7th Cir. 2010), including by considering hearsay evidence, *see S.E.C. v. Cherif*, 933 F.2d 403, 412 n.8 (7th Cir. 1991).

In terms of reliability generally, including the lack of verification of the women's reports, there is no reason to think that the women have a motivation to be dishonest with PPINK employees. After all, the women were contacting PPINK because they *wanted an abortion*, and they changed their minds only after realizing what that would take. Moreover, the examples represent a plausible, if not likely, consequence of the new ultrasound law, which requires certain women in Indiana make an additional lengthy trip in order to obtain an abortion. The reliability of these examples is therefore increased by the fact that they fall squarely within the foreseeable

consequences for low-income women who now have to take on additional time and expense to obtain an abortion.

It is also worth noting that the State asks the Court to discount this evidence because it does not come directly from the impacted women nor has it been otherwise verified, when, as discussed further below, the State's *only* evidence that the law furthers its interest in promoting fetal life is from a woman whose testimony was admitted into evidence through the declaration of her physician.  If for the purposes of this preliminary injunction the Court failed to consider any evidence not directly from its source, the State would be left without any evidence directly supporting its position.

Second, the State points out that it is unclear whether any of the women obtained an abortion from a different provider.  (Filing No. 35-5 at 33.)  But the only non-PPINK abortion providers in Indiana are located in Indianapolis.  It makes little sense to think that women who contacted PPINK to schedule an abortion but ultimately could not obtain one because of the difficulties caused by an additional lengthy trip to a PPINK health center could any more easily make an additional trip to a different abortion provider in Indianapolis, where PPINK also provides abortion services.  And to the extent these women could have obtained an abortion in another state, the availability of abortions across state lines cannot justify otherwise unduly burdensome abortion laws.  *See Schimel*, 806 F.3d at 918-19 (rejecting the State's position that women prevented from obtaining an abortion in Wisconsin could travel to Chicago to obtain one).

In the end, the specific examples of women who have been unable to obtain an abortion are certainly reliable enough for consideration when assessing the propriety of a preliminary injunction in this case, and they constitute additional significant evidence that the new ultrasound law creates barriers for low-income women seeking an abortion in Indiana.

b. __Benefits__

The Court turns next to the evidence that the new ultrasound law furthers the interests asserted by the State.  According to the State, the "main purpose" of the new ultrasound law "is to give women seeking an abortion the opportunity to view an image of her baby before making her decision, with hope that she will reflect on that image (and other information provided) and decide against abortion."  (Filing No. 35 at 16.)  This is undoubtedly a legitimate interest for the State to pursue.  *See Casey*, 505 U.S. at 870 ("[T]he State has a legitimate interest in promoting the life or potential life of the unborn."); *id* at 886 ("[A] State is permitted to enact persuasive measures which favor childbirth over abortion, even if those measures do not further a health interest.").  The State also asserts an alternative justification—namely, that the law promotes "maternal psychological health."  (Filing No. 35 at 27-28.)  This is also a legitimate state interest.  *See Schimel*, 806 F.3d at 910.

Although these are legitimate interests, nearly all of the State's evidence addresses the wrong question and, as such, fails to demonstrate that the new ultrasound law furthers its asserted interests.  The relevant question is whether the ultrasound law provides the asserted benefits *as compared to the prior law*.  *See Whole Woman's Health*, 136 S. Ct. at 2311 ("We have found nothing in Texas' record evidence that shows that, *compared to the prior law*, . . . the new law advanced Texas' legitimate interest in protecting women's health."); *id.* at 2314 ("The record contains nothing to suggest that [the challenged law] *would be more effective than pre-existing Texas law* . . . .") (emphasis added); *id.* at 2315 (concluding that the district court's findings were "well supported" that the new regulations did not advance women's health any more than the previous regulations).  Therefore, the specific question here is not whether viewing the ultrasound promotes fetal life or improves women's mental health outcomes; even before the new ultrasound

30

law was passed, women were required to have the opportunity to view the ultrasound prior to an abortion, and thus any such benefits from viewing the ultrasound were already present.  Instead, the question is whether requiring women to have an ultrasound *at least eighteen hours prior to an abortion* increases any such benefits.  Most of the State's evidence does not address this question.  Nevertheless, the Court will address the evidence presented in support of each of the two interests in turn.

### i.   **Promoting Fetal Life**

Viewing the Ultrasound.  The State contends that viewing the ultrasound image is more likely to discourage a woman from having an abortion than the representations of fetuses that are included in the materials provided at the informed-consent appointment.  Dr. Christina Francis, an a physician with an OB/GYN practice, attests that in her practice she has advised women considering abortion, and "[s]ome of these patients . . . [have] told [her] that viewing an ultrasound image of their baby caused them to decide not to obtain an abortion.  They have told [her] that seeing the live, moving images of their babies, with arms and legs and a heartbeat, helped them bond with the child and view it as more than just a clump of cells."  (Filing No. 35-1 at 4-5.)

The evidence from Dr. Francis that viewing the ultrasound image was relevant to some of her patients' decision as to whether to have an abortion certainly constitutes evidence that viewing the ultrasound may impact some women's decisions regarding whether they should have an abortion.  However, PPINK rightly points out that even if viewing the ultrasound has any effect on a woman's decision to have an abortion, the degree to which it does so is questionable given that the law permits each woman to choose whether or not they will view the ultrasound, and most women choose not to.  In fiscal year 2016, only 25% of women who had an abortion at a PPINK health center viewed the ultrasound.  (Filing No. 24-1 at 6.)  It is difficult to conclude then that the

new ultrasound law promotes fetal life in any significant way when three-fourths of women in Indiana do not even view the ultrasound image.

But there is a more fundamental issue with this evidence.  As noted above, even if there is evidence that viewing the ultrasound convinces some women not to have an abortion, this is not evidence of the critical question, which is whether viewing the ultrasound *eighteen hours before the abortion* increases its impact.  Evidence that some women's decisions as to whether to have an abortion are impacted by viewing the ultrasound is not evidence that doing so at least eighteen hours before the abortion, rather than on the day of the abortion, has any additional persuasive impact.

<u>Statistical Evidence Regarding Voluntary Viewing of an Ultrasound</u>.  The State also relies on statistical evidence to support its position that women who view the ultrasound are less likely to have an abortion.  Specifically, the State points to a 2014 study that examined the impact that voluntarily viewing an ultrasound image had on women's decisions whether to have an abortion. (*See* Filing No. 35 at 25.)  The study reviewed more than 15,000 women who had sought abortion services from a Planned Parenthood health center in Los Angeles, California and had the option of viewing their ultrasound.  The State notes that the study concluded that "voluntary viewing [of an ultrasound] was associated with some women's decision to continue the pregnancy."  (Filing No. 35 at 25 (quoting Mary Gutter, et al., *Relationship Between Ultrasound Viewing and Proceeding to Abortion*, 123 Obstetrics & Gynecology 81, 85 (2014))).

PPINK's response to this study is three-fold and worthy of detailed examination, as this study ultimately reveals how meager the evidence is regarding any connection between voluntary viewing of an ultrasound and the decision to have an abortion, let alone evidence that any such connection is enhanced if the ultrasound if viewed eighteen hours prior to an abortion.

First, the study's specific conclusion is far from compelling support for the position that viewing the ultrasound impacts women's decisions whether to have an abortion; it concluded that "the effect [of viewing the ultrasound] was very small—and should be considered with caution—and limited to the 7% of patients with medium or low decision certainty." *Id.* Of the 15,000 pregnant women considered by the study, 98.8% of pregnancies ended in abortion; 99.0% ended in abortion when the woman did not view the ultrasound; and 98.4% ended in abortion when the woman viewed the ultrasound. *Id.* at 83. For women with "high decision certainty," which was the vast majority of women, viewing the ultrasound had no effect. *Id.* at 84. For women with medium or low decision certainty (7.4%), the effect was "very small." *Id.* at 85. Thus, even for the minority of women who view the ultrasound—at PPINK facilities in Indiana it is approximately 25%—the overwhelming majority of them have a high decision certainty and thus there is no impact for them at all. (*See* Filing No. 24-1 at 7 (noting that in the experience of PPINK's staff, "women have made a firm and well-thought out decision to have an abortion before they arrive for their appointment," and "virtually all women who [go] to [PPINK] for abortion services and receive an ultrasound do get an abortion and that this figure is not influenced or altered by whether or not the woman views the ultrasound or listens to the fetal heart tone"). For the substantial minority of women who have medium or low decision certainty—only 7.4% in the 2014 study—and choose to view the ultrasound, the effect is "very small." This all amounts to a "very small" impact on a small percentage of abortion patients.

Second, the study notes that the gestational age of the fetus is a more important factor in predicting whether a woman will decide to go through with an abortion. Specifically, it concludes "women's comfort terminating their pregnancies decreases as gestation advances." *Id.* at 86. This, says the study, shows that "it is the information the ultrasound sound scan renders—ie, gestational

dating—rather than the image that influences women's decision-making." *Id.* In Indiana, although the ultrasound confirms gestational age, Indiana law requires women to be provided the "probable gestational age" of the fetus during the informed-consent appointment, regardless of whether they choose to view the ultrasound. Ind. Code § 16-34-2-1.1(a)(1)(F). This evidence, in conjunction with Indiana law, undermines the premise of the State's goal—to "give women seeking an abortion the opportunity to view an image of her baby before making her decision, with hope that she will reflect on that image . . . and decide against abortion," (Filing No. 35 at 16)—which is predicated on *the ultrasound image* impacting women's decisions. Simply put, if it is the gestational age rather than the ultrasound image creating a small impact on women's decisions, and women in Indiana are given that information whether or not they view the ultrasound, the State's desired persuasive impact is occurring irrespective of the ultrasound, and thus the ultrasound itself has no additional effect.

Third and most critically, the State's reliance on this study suffers from the same deficiency as its evidence presented by Dr. Francis. Even accepting that there is evidence that viewing the ultrasound has a small impact on a woman's decision whether to have an abortion, any such evidence is entirely irrelevant to the legal question before the Court. Again, the Court must assess whether viewing the ultrasound at least eighteen hours before the abortion has a greater impact on a woman's decision than viewing it the day of the abortion. PPINK is correct that "[t]his study sheds absolutely no light on that question." (Filing No. 38 at 17.)

Accordingly, like Dr. Francis's attestation that some of her patients have been impacted by viewing the ultrasound image, the statistical evidence fails to in any way support the State's position that the new ultrasound law advances its goal in promoting fetal life.

Informed-Consent Waiting Periods.  The State introduces evidence that informed-consent waiting periods are commonly used to give patients time to consider important medical decisions. Specifically, Dr. Francis attests that informed-consent waiting periods "give patients time to reflect on the information they have received, weigh the possible risks and benefits of the procedure, discuss the procedure with loved ones, and ask questions of the doctor."  (Filing No. 35-1 at 2-3.) She states that, for life-altering procedures, she provides informed-consent information one to four weeks prior to the procedure.  (*See* Filing No. 35-1 at 3.)  Dr. Francis does not, however, appear to provide abortion services and thus does not attest to an informed-consent practice for abortion services.

PPINK argues that abortions are different than many other procedures where lengthy informed-consent periods are utilized because, unlike in those contexts where the doctor discusses with the patient a previously undiagnosed medical condition, a woman at a PPINK informed-consent appointment "already knows her diagnosis (that she is pregnant), knows her options (continue the pregnancy or have an abortion), and has received a great deal of information about abortion, including the risks and benefits."  (Filing No. 38 at 16.)  Moreover, PPINK disputes Dr. Francis's testimony by pointing to Dr. Stutsman's statement that he does a range of "office procedures," such as colposcopies and LEEP procedures, on the same day as he provides the informed-consent information.  (Filing No. 35-4 at 6.)

It is undoubtedly correct that informed-consent waiting periods generally provide patients time to consider information they have received.  *See Casey*, 505 U.S. at 885 ("[T]he idea that important decisions will be more informed and deliberate if they follow some period of reflection does not [seem] unreasonable.").  The State presents this general evidence regarding informed-consent waiting periods ostensibly in an attempt to characterize the new ultrasound law—and the

shifting of the ultrasound requirement from the day of an abortion to the informed-consent appointment—as fitting neatly into a method of promoting fetal life by providing time for deliberation.  But the general notion that informed-consent waiting periods provide time for deliberation does not address the narrower question of whether the timing of the ultrasound increases its impact on a woman's decision whether or not to have an abortion.

The evidence that informed-consent periods give patients time to reflect on their decisions only furthers the State's position if there is specific evidence that *additional time to reflect on the ultrasound image*—assuming women choose to view it, which only 25% do—decreases the likelihood that women will go through with an abortion.  As discussed herein, there is little to no concrete evidence that this is true.  Undoubtedly the ultrasound image is a piece of information on which women could use the eighteen-hour period to reflect.  But the evidence, including the study regarding voluntary ultrasound viewing discussed above, reveals that viewing the ultrasound likely has little to no impact.  It is simply not a reasonable assumption, given the absence of specific evidence on the question, that further time to deliberate on an image that has nearly no impact at the time, would create a meaningfully stronger impact after eighteen hours.  Indeed, in the absence of evidence one way or another, it is just as reasonable to assume that the impact of viewing the ultrasound image dissipates, rather than increases, over time.

Specific Example.  Dr. Francis testified regarding one of her patients who may have been impacted by the new ultrasound law had it been in effect at the time.  She provided similar testimony to the Indiana legislature regarding this woman before it passed the new ultrasound law.  Specifically, Dr. Francis testified that the woman had an abortion but:

> regretted doing so and feels that an ultrasound waiting period would have given her more time to consider her decision and change her mind. . . .  [On the day of her abortion,] [s]he chose not to view the ultrasound image because she felt that if she saw an image of her baby it would cause her to change her mind.  She told [Dr.

36

Francis] that she did not want to be persuaded not to abort because she was already at the clinic, had paid for the abortion, and felt pressured by those circumstances to go through with it.  [She] told [Dr. Francis] that had she undergone the ultrasound the day before the abortion, she likely would have viewed the image and she does not think she would have come back the next day to proceed with the medication abortion.

([Filing No. 35-1 at 5](#).)

PPINK responds that this evidence is the State's "only" evidence addressing the relevant question and argues that it is "speculation on top of speculation."  ([Filing No. 38 at 18](#).) Specifically, PPINK argues that:

not even from the perspective of hindsight can the woman say that receiving the ultrasound earlier would have definitely led to her deciding to view the ultrasound, let alone determining not to proceed with the abortion ('she likely would have viewed the image,' 'she does not think she would have come back the next day').

([Filing No. 38 at 18](#)).

The evidence from Dr. Francis undoubtedly constitutes at least some evidence that certain women may change their minds about having an abortion if the ultrasound occurs prior to the day of the abortion.  PPINK is correct, however, that this evidence is exceedingly speculative.  While acknowledging that in hindsight the woman thinks her decision-making process regarding her abortion may have been altered had the ultrasound occurred the day before the abortion, her own statements concerning what she may have done in hindsight contain multiple layers of speculation. She can only say that she "likely" would have viewed the ultrasound image if it was offered a day earlier and, had she, she "likely" would not have returned for the abortion the next day.  This is far from compelling evidence that the new ultrasound law would have the impact desired by the State, and as such, it must be given diminished weight in the balancing process.

<u>Pressure at Appointments</u>.  The State posits that the new ultrasound law will remove the pressure some women face on the day of the abortion to go through with the procedure, which is

caused by the fact that they are already at the clinic and have paid for their abortion.  The only specific evidence of this is the example already discussed above of a woman who felt such pressure and the State's reference to PPINK's "apparent lack of refund policy."  (Filing No. 35 at 26.)

Although PPINK's President testified that she was uncertain whether PPINK has a refund policy, PPINK's Director of Abortion Services, Ms. Beeley, attests that PPINK has a refund policy:  any woman who opts not to have an abortion following the ultrasound would be refunded all funds, not including the fee paid for the ultrasound.  (Filing No. 38-1 at 3.)  The evidence is clear that—whether the ultrasound is performed the day before the abortion or the day of—the $100.00 ultrasound fee will not be reimbursed, and thus the financial pressure to go through with the abortion will be present.  Either way, the woman can receive a full refund of the $410.00 abortion fees after the ultrasound but before the abortion.  Therefore, the new ultrasound law does not relieve any pressure caused by financial concerns.

### ii.      Promoting Women's Mental Health

The State's alternative justification for the new ultrasound law is that "viewing the [ultrasound] image has important psychological benefits" for the woman.  (Filing No. 35 at 27.).  The State presents little evidence to support this justification, and it indeed notes that its "main" justification is promoting fetal life.

The State's psychiatry expert, Dr. Aaron Kheriaty, states in his declaration that "[m]any abortion patients are morally and emotionally conflicted about the abortion decision, and those who choose to go through with the procedure often report conflicted feelings of ambivalence, regret, or distress afterwards."  (Filing No. 35-2 at 2.)  Both Dr. Kheriaty and the State's sociologist, Dr. Hendershot, point to studies done by Dr. Priscilla Coleman, one of which showed

that the rate of "mental health claims of low-income California women . . . was 17 percent higher for the women who aborted than for those who gave birth." (Filing No. 35-3 at 4.)

PPINK's response to this evidence is two-fold.  First, it presents a declaration from Dr. Stutsman who points to two literature reviews that criticize Dr. Coleman's studies as outliers that have been almost uniformly rejected by other experts in the field.  (*See* Filing No. 38-3 at 2-5.) For example, two mental health organizations did a comprehensive review of studies on mental health and abortion, one of which concluded that the rates of mental health issues were the same for women who had an abortion and those who gave birth, and the other found that women who "have a single, legal, first-trimester abortion of an unplanned pregnancy for non-therapeutic reasons" had the same risk of mental health problems as women who give birth.  (Filing No. 83-3 at 2-3 (citing Filing No. 83-4, 83-5).)  Moreover, both of these mental health organizations specifically criticized Dr. Coleman's studies as lacking: one study cited by the State was described as having "a number of methodological limitations making it difficult to interpret the results" and simply "poor," while another study cited by the State was described as similarly having methodological problems that bring "into question both the results and conclusions." (Filing No. 35-3 at 4-5 (citing Filing No. 83-4, 83-5).)  In short, PPINK's evidence is significantly more persuasive on this issue, especially given that Dr. Coleman's studies are the subject of significant criticism.

Second, and more importantly, PPINK is again correct that the State's evidence fails to address the relevant question.  Even if the results of Dr. Coleman's studies are accepted, this is not evidence that women having an ultrasound eighteen hours prior to the abortion as opposed to the day of the abortion have more favorable psychological outcomes.

In sum, while many abortion patients are undoubtedly morally and emotionally conflicted about their decision, there is no evidence that the new ultrasound law promotes women's psychological health.  The State admitted that it had no "direct evidence" that it did.  Like much of the State's evidence discussed above, Dr. Coleman's studies do not address the relevant question of whether having an ultrasound at least eighteen hours before an abortion mitigates any of the consequences that purportedly exist.  Accordingly, there is no evidence that the new ultrasound law furthers the State's interest in safeguarding women's psychological health.

### c.   <u>Weighing the Burdens and Benefits</u>

Having reviewed the parties' evidence, the Court must resolve the ultimate question of whether the new ultrasound law creates an undue burden.  "To determine whether the burden imposed by the statute is undue (excessive), the court must weigh the burdens against the state's justification, asking whether and to what extent the challenged regulation actually advances the state's interests.  If a burden significantly exceeds what is necessary to advance the state's interests, it is undue, which is to say unconstitutional."  *Schimel*, 806 F.3d at 919 (citation and quotation marks omitted); *see Whole Woman's Health*, 136 S. Ct. at 2309.

The Court must assess the burdens for those whom the burdens are an "actual rather than an irrelevant restriction," *Whole Woman's Health*, 136 S. Ct. at 2320, which is low-income women who live a substantial distance from one of the six PPINK health centers offering informed-consent appointments.  The evidence reveals that these women face various and substantial burdens due to a significantly increased travel distance to the informed-consent appointments.  Not only do these women have to pay for the additional travel expenses, but many have difficulty obtaining or paying for childcare, will lose up to an entire day's wages, and risk losing their employment altogether.  They also have greater difficulty keeping their abortion confidential from abusive partners.  Both

the Supreme Court and the Seventh Circuit have recognized that burdens associated with an

increase in required travel are significant, especially for low-income women.

> As noted by the Seventh Circuit,

> [it is true that] a 90–mile trip is no big deal for persons who own a car or can afford
> an Amtrak or Greyhound ticket. But more than 50 percent of Wisconsin women
> seeking abortions have incomes below the federal poverty line and many of them
> live in Milwaukee (and some north or west of that city and so even farther away
> from Chicago). For them a round trip to Chicago, and finding a place to stay
> overnight in Chicago should they not feel up to an immediate return to Wisconsin
> after the abortion, may be prohibitively expensive. The State of Wisconsin is not
> offering to pick up the tab, or any part of it. These women may also be unable to
> take the time required for the round trip away from their work or the care of their
> children.

*Schimel*, 806 F.3d at 919; *see Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 738 F.3d 786,

796 (7th Cir. 2013) (noting that requiring women to travel "400 miles" for their two required

appointments is a "nontrivial burden on the financially strapped and others who have difficulty

traveling long distances to obtain an abortion, such as those who already have children").  The

Supreme Court addressed burdens associated with lengthy travel caused by an abortion regulation

in *Whole Woman's Health*, and although it noted that they "do not always constitute an 'undue

burden,'" they are a legitimate burden that, depending on the other particulars of the case, can

ultimately contribute to the burdens being undue.  136 S. Ct. at 2313.

The new ultrasound law has not only made it more difficult for women to make the

necessary arrangements to travel to the informed-consent appointment, but it has also funneled all

of the informed-consent appointments into six instead of seventeen PPINK health centers.  This

has required PPINK to double-book appointments, which has increased the wait times for women

at the health centers.  *Cf. Whole Woman's Health*, 136 S. Ct. at 2313 (noting, while assessing the

burdens caused by the closure of abortion clinics, that "[t]hose closures meant fewer doctors,

longer waiting times, and increased crowding").

41

Dr. Collins's testimony and the specific examples of nine Indiana women reveal how the foregoing burdens combine in a variety of ways to ultimately prevent some women from obtaining an abortion that they otherwise would.  Given that (1) over a third of surgical abortions at PPINK occur within three weeks of the thirteen week, six day deadline, (2) making two lengthy trips for low-income women in quick succession is often difficult, (3) the PPINK health centers offering informed-consent appointments are now overburdened, and (4) abortion appointments are only available as little as once a week and at most three times a week at PPINK's health centers, it would be surprising if the new ultrasound law did *not* prevent a significant number of the low-income women from obtaining an abortion.  And, indeed, PPINK's evidence reveals that it already has for several women.  *See Schimel*, 806 F.3d at 908 (weighing as a burden the fact that "[w]omen seeking lawful abortions . . . late in their pregnancy, either because of the waiting list or because they hadn't realized their need for an abortion sooner, would be unable to obtain abortions in Wisconsin").

In sum, PPINK's evidence credibly reveals—at least at this early stage in the litigation— that the new ultrasound law significantly burdens the category of women for whom the law is "actual rather than an irrelevant restriction."  *Whole Woman's Health*, 136 S. Ct. at 2320.  The combination of burdens discussed above places a substantial obstacle in the path of these women seeking an abortion.

Against these burdens, the Court must weigh the evidence that the new ultrasound law furthers the State's asserted interests in promoting fetal life and women's mental health.  The State has almost no evidence that the new ultrasound law promotes fetal life—except for one relatively speculative example—or women's mental health.

As to promoting fetal life, the State's statistical evidence shows that viewing the ultrasound impacts some women's decisions regarding abortion.  But, as explained in detail above, the study on which the State relies describes the impact as a "very small" impact only on the 7% of women who had a low or medium decision certainty and no impact on the other women who have a high decision certainty.  Moreover, for *any* impact to occur, the women who have low or medium decision certainty must actually view the ultrasound.  Indiana law does not require them to do so, and only 25% of PPINK's patients do.  In total, this means that the impact of viewing the ultrasound on women's decisions about their abortion amount to a "very small" impact on only the women who both have a low or medium decision certainty (7%) and who also view the ultrasound (25%).  As a statistical matter, this impact is at best marginal.  Moreover, the impact may be caused by women learning the gestational age of the fetus, which Indiana law requires women to learn independently of the ultrasound viewing.  And most importantly, even this paltry evidence says nothing about the impact of viewing the ultrasound *at least eighteen hours prior to the abortion* rather than the day of the abortion, which is the critical question.

The State's best evidence is the example from Dr. Francis regarding one of her patients who had an abortion and says that her decision-making process would have been different had the ultrasound occurred at the informed-consent appointment.  While this is at least some evidence that a woman might change her mind about having an abortion if the ultrasound occurs prior to the day of the abortion, the evidence is speculative and thus entitled to little weight, especially because it is not corroborated by any other evidence.  Therefore the State's evidence that the new ultrasound law increases the likelihood that women will choose not to have an abortion by requiring the ultrasound to occur at least eighteen hours prior borders on nonexistent, save one speculative example suggesting that it might have an impact.

As to the State's asserted interest in promoting women's mental health, the State's evidence that abortions cause negative mental health outcomes is suspect at best, and PPINK's evidence that there is no such correlation is convincing.  But, again, even if there were such evidence, the State has no evidence regarding whether *the timing* of the ultrasound impacts a woman's mental health outcomes.

Given the foregoing evidence, the Court is left to weigh concrete and compelling evidence that the new ultrasound law imposes significant burdens against a near absence of evidence that the law promotes either of the benefits asserted by the State.  This is similar to the balancing in *Schimel* and *Whole Woman's Health*, where the Seventh Circuit and Supreme Court, respectively, found that an undue burden existed because the challenged laws burdened the right to an abortion and there was little to no evidence that the laws actually furthered the State's justification.  The Seventh Circuit explained:

> [A] statute that curtails the constitutional right to an abortion . . . cannot survive challenge without evidence that the curtailment is justifiable by reference to the benefits conferred by the statute. The statute may not be irrational, yet may still impose an undue burden—a burden excessive in relation to the aims of the statute and the benefits likely to be conferred by it—and if so it is unconstitutional.

806 F.3d at 921; *see id.* at 919 ("The feebler the medical grounds (in this case, they are nonexistent), the likelier is the burden on the right to abortion to be disproportionate to the benefits and therefore excessive."); *Whole Woman's Health*, 136 S. Ct. at 2318 (striking down the challenged abortion restrictions because the law "provides few, if any, health benefits for women" and "poses a substantial obstacle to women seeking abortions"); *see also Van Hollen*, 738 F.3d at 798 ("The feebler the medical grounds, the likelier the burden, *even if slight*, to be 'undue' in the sense of disproportionate or gratuitous.") (emphasis added).

It is not irrational for the State to posit that viewing the ultrasound image a day before the abortion might impact some women's choices regarding whether to go through with an abortion. As noted above when discussing the State's evidence regarding waiting periods generally, waiting periods can of course provide additional time for thoughtful deliberation.  *See Casey*, 505 U.S. at 885.  But this case is not about waiting periods generally; it is about moving a particular step of the abortion process—the voluntary ultrasound viewing—from the day of the abortion to the informed-consent appointment with the hopes that further deliberation on the ultrasound image will impact women's decision.  Yet the evidence presented by the State that this actually accomplishes its goal lacks force.  Not only is the impact of viewing the ultrasound slight and may not even be caused by viewing the ultrasound image, but women are not even required to view it at all.  And there is no evidence that this slight impact—for the women who choose to view it—is enhanced if it occurs at least eighteen hours before the abortion rather than the day of the abortion. The Court is therefore left with a statute that undoubtedly "curtails the right to an abortion," but with no evidence "that the curtailment is justifiable by reference to the benefits conferred by the statute."  *Schimel*, 806 F.3d at 921.  The burdens imposed by the new ultrasound law are thus undue in the sense that they are excessive in relation to the benefits conferred, making the it likely unconstitutional.

The State resists this conclusion on two related bases, neither of which are ultimately persuasive.  First, the State points to cases such as *Casey* and *A Woman's Choice-East Side Women's Clinic v. Newman*, 305 F.3d 684 (7th Cir. 2002), where the courts held that twenty-four hour informed-consent waiting periods did not impose an undue burden, even though they required two sometimes lengthy trips in order to obtain an abortion.  (*See* Filing No. 35 at 20-21.)  But these cases do not dictate the same result here.  Inherent in the undue burden test is that the evidence of

burdens and benefits must be examined in the context presented. *See Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 914 (9th Cir. 2014) (noting that the Seventh Circuit in *Van Hollen* recognized that the undue burden test is "context-specific," which is to say that it "requires [courts] to weigh the extent of the burden against the strength of the state's justification in the context of each individual statute or regulation"). Thus, while the State is correct that laws requiring a waiting period and therefore two trips to a health center in order to have an abortion have been upheld, it does not follow that all such laws, regardless of the specific burdens imposed and benefits conferred, are constitutional.

The Supreme Court's analysis of the twenty-four hour waiting period requirement in *Casey* demonstrates this. In analyzing whether the waiting period imposed an undue burden, it first recognized that the "idea that important decisions will be more informed and deliberate if they follow some period of reflection [is] not . . . unreasonable, particularly where the statute directs that important information become part of the background of the decision." 505 U.S. at 885. The Supreme Court reasoned that "*[i]n theory*, at least, the waiting period is a reasonable measure to implement the State's interest in protecting the life of the unborn, a measure that does not amount to an undue burden." *Id.* (emphasis added). But importantly, this was only in theory. The Supreme Court went on to analyze whether the provision was "nonetheless invalid because in practice it is a substantial obstacle to a woman's choice to terminate her pregnancy," which was "closer question." *Id.* Ultimately, it was not an undue burden "on the record" before the Court, noting that the "District Court did not conclude that the waiting period is [a substantial] obstacle even for the women who are most burdened by it." *Id.*

The analysis in *Casey* reveals that the undue burden analysis is case specific and that, in another case with different evidence, the result may be different. Here, PPINK does not challenge

waiting periods generally, but challenges the requirement that the voluntary ultrasound viewing be a part of the informed-consent appointment.  The State has produced nearly no evidence that this change has the benefits it asserts, and PPINK has provided significant evidence that this law is burdensome such that the Court has concluded it poses a substantial obstacle for the group of women at issue.

Second and relatedly, the State argues that the burdens caused by the ultrasound law are relatively light compared to the burdens caused in other cases.  (Filing No. 35 at 29.)  For example, in *Whole Woman's Health*, the challenged law led to the closure of half of the abortion clinics in Texas.  136 S. Ct. at 2312.  While this is undoubtedly true, this argument, like that above, fails to recognize the case-specific nature of the undue burden inquiry.  *See Humble*, 753 F.3d at 914.  This inquiry requires a comparison not of the burden in this case against burdens deemed undue in other cases, but a weighing of the particular burdens and benefits based on the evidence presented.  *See Whole Woman's Health*, 136 S. Ct. at 2309; *Schimel*, 806 F.3d at 919.

Nevertheless, other cases can of course provide guidance.  The Court has heavily relied on the guidance provided in *Schimel* and *Whole Woman's Health* to conclude that when, as here, the evidence of benefits is slight, evidence of burdens need not be overwhelming for the burdens to be undue.  Moreover, comparing the burdens here to those in *Whole Woman's Health* supports the Court's conclusion.  While the new ultrasound law did not lead to the closure of any abortion clinics in Indiana like the challenged Texas law, it at least had a similar effect as it relates to the mandatory informed-consent appointment.  Now, instead of being able to attend one of seventeen PPINK health centers for an informed-consent appointment, women must travel to one of only six PPINK health centers that offer them.  The ultrasound law has essentially closed nearly two-thirds of the PPINK health centers available for this necessary appointment.  Thus, although the burdens

here are not nearly as extensive as in *Whole Woman's Health*, they are similar in kind such that they are significant enough to outweigh the almost complete lack of benefits.

In sum, the State's arguments fail to undermine the above balancing.  That balancing reveals that the new ultrasound law creates an undue burden on a woman's right to terminate her pregnancy.  PPINK therefore has a strong likelihood of success on the merits of its claim.

**B.**     **<u>Irreparable Harm</u>**

The parties' assessment of the remaining preliminary injunction factors is succinct, likely because they each acknowledge that the assessment of PPINK's likelihood of success on the merits is essentially determinative.  Nevertheless, the Court must address the remaining factors in order to determine whether a preliminary injunction is warranted.

The second preliminary injunction factor requires PPINK to show "that it is likely to suffer irreparable harm in the absence of preliminary relief."  *Grace Schools*, 801 F.3d at 795.  To demonstrate irreparable harm, PPINK points to the fact that the new ultrasound law presents substantial obstacles for many of its patients such that some are unable to obtain an abortion altogether.  (Filing No. 24 at 30.)  The State responds that PPINK can mitigate these harms by expending more financial resources on abortion services, and therefore the harm to it cannot be considered irreparable.  (Filing No. 35 at 37-38.)

The evidence shows that the new ultrasound law has and will continue to prevent PPINK from providing abortion services to certain Indiana women, and the Court has determined that this law is likely unconstitutional.  For PPINK and its patients who lose the opportunity to exercise their constitutional right to choose to terminate their pregnancy, the irreparable harm is clear.  *See Van Hollen*, 738 F.3d at 796.

48

As to the State's contention that PPINK can simply expend more resources to avoid this harm, the evidence does not reveal this as a viable option for PPINK.  It already responded to the new ultrasound law by shifting resources to allow two more health centers to offer ultrasounds and to keep their health centers open longer hours to work through double-booked appointments.  (*See* Filing No. 24-1 at 9-12.)  Some of these changes are temporary solutions that PPINK cannot sustain.  (Filing No. 24-1 at 12.)  Accordingly, the evidence as found by the Court does not support the State's position.

Even if this were not the case, the harm flowing from a violation of a person's substantive due process rights is presumed irreparable.  *See Planned Parenthood of Indiana & Kentucky, Inc.*, 2016 WL 3556914, *12 (explaining how the presumption of irreparable harm applicable to certain constitutional violations apply to substantive due process violations).  For both of these reasons, PPINK has made the requisite showing of irreparable harm.

## C.      Balance of Harms, Public Policy Considerations, and Sliding Scale Analysis

"To obtain a preliminary injunction, the moving party must show that its case has some likelihood of success on the merits and that it has no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied."  *Stuller, Inc.*, 695 F.3d at 678.  For the reasons stated above, PPINK has made these showings.  "If the moving party meets these threshold requirements, the district court 'must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied.'"  *Id.* (quoting *Ty, Inc.*, 237 F.3d at 895).  "The district court must also consider the public interest in granting or denying an injunction."  *Id.*

PPINK argues that its likelihood of success on the merits is strong and thus it need not make a particularly strong showing regarding the balance of harms.  It can make this showing

easily, in its view, because the State will not be harmed by maintaining the status quo, nor can the State maintain that being required to comply with the Constitution is harmful.  (Filing No. 24 at 31.)  The State offers little in response, arguing generally that it faces the harm caused when a democratically enacted law is enjoined and that an injunction would prevent it from furthering its legitimate goal of promoting fetal life.  (Filing No. 35 at 38.)

The harms faced by PPINK and its patients are irreparable and substantial.  The evidence reveals that the new ultrasound law has already prevented several women from obtaining an abortion, and given the obstacles it creates and the burden these obstacles impose particularly on low-income women in Indiana, it will continue to do so absent a preliminary injunction.  Although the State's interest in promoting fetal life is a legitimate one, the State failed to present nearly any evidence that the timing of the ultrasound furthers this interest or its interest in furthering women's mental health.  This leaves only the State's generalized harm caused by the delay of the implementation of its democratically enacted law, which is clearly outweighed by the harm to PPINK and its patients.  *See Van Hollen*, 738 F.3d at 796 ("[I]t is beyond dispute that the plaintiffs face greater harm irreparable by the entry of a final judgment in their favor than the irreparable harm that the state faces if the implementation of its statute is delayed.  For if forced to comply with the statute, only later to be vindicated when a final judgment is entered, the plaintiffs will incur in the interim the disruption of the services that the abortion clinics provide.").

PPINK is also correct that the public interest would be served by enjoining the new ultrasound law, as the vindication of constitutional rights serves the public interest.  *See Joelner v. Vill. of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004) ("Surely, upholding constitutional rights serves the public interest.") (citation and quotation marks omitted); *see also Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978) ("The existence of a continuing constitutional

violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest.").

Having examined all of the relevant factors, the Court must "weigh[] the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Turnell*, 796 F.3d at 662. Given the almost complete absence of evidence that the new ultrasound law furthers the State's asserted interests, PPINK has a strong likelihood of success on its challenge to the new ultrasound law. PPINK thus need not make an especially strong showing that the balance of harms weighs in its favor, but it nevertheless has. Accordingly, PPINK is entitled to an injunction prohibiting the enforcement of the new ultrasound law pending the resolution of this litigation.

## IV.   CONCLUSION

The Court has "weigh[ed] all the factors" and sought "at all times to minimize the costs of being mistaken." *Stuller, Inc.*, 695 F.3d at 678. The Court has done so in light of the Supreme Court's warning that "injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 376. Nevertheless, PPINK has demonstrated that it is entitled to the injunction it seeks.

The new ultrasound law creates significant financial and other burdens on PPINK and its patients, particularly on low-income women in Indiana who face lengthy travel to one of PPINK's now only six health centers that can offer an informed-consent appointment. These burdens are clearly undue when weighed against the almost complete lack of evidence that the law furthers the State's asserted justifications of promoting fetal life and women's mental health outcomes. The evidence presented by the State shows that viewing an ultrasound image has only a "very small"

impact on an incrementally small number of women.  And there is almost no evidence that this impact is increased if the ultrasound is viewed the day before the abortion rather than the day of the abortion.  Moreover, the law does not require women to view the ultrasound imagine at all, and seventy-five percent of PPINK's patients choose not to.  For these women, the new ultrasound has no impact whatsoever.  Given the lack of evidence that the new ultrasound law has the benefits asserted by the State, the law likely creates an undue burden on women's constitutional rights.

For these reasons, PPINK's Motion for Preliminary Injunction (Filing No. 6) is **GRANTED**.  Pursuant to Federal Rule of Civil Procedure 65(d), the Court **ISSUES A PRELIMINARY INJUNCTION** prohibiting the State from enforcing the portion of the new ultrasound law found in Indiana Code § 16-34-2-1.1(a)(5) that requires the mandatory ultrasound to occur at least eighteen hours before an abortion and at the same time the other informed-consent information mandated by law is provided to the patient.  Because the State has not disputed PPINK's position that the State will not incur monetary damages from an injunction, PPINK need not post a bond.

**SO ORDERED.**

Date: 3/31/2017

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Gavin Rose
ACLU OF INDIANA
grose@aclu-in.org

Jan P. Mensz
ACLU OF INDIANA
jmensz@aclu-in.org

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Jennifer Dalven
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
jdalven@aclu.org

Cale Addison Bradford
INDIANA ATTORNEY GENERAL'S OFFICE
cale.bradford@atg.in.gov

Thomas M. Fisher
INDIANA ATTORNEY GENERAL'S OFFICE
tom.fisher@atg.in.gov